IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| J.H., by and through her legal guardian, Pam Holman<br><br>                              Plaintiff,<br>v.<br><br>JUST FOR KIDS, INC.,<br><br>                              Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING 12(b)(6) MOTION TO DISMISS**<br><br>Case No. 2:16-cv-00358-JNP-DBP<br><br>District Judge Jill N. Parrish |

Before the court is a Motion to Dismiss filed by Defendant Just for Kids, Inc. pursuant to Fed. R. Civ. P. 12(b)(6). (Docket No. 6). Defendant asks this court to dismiss Plaintiff J.H.'s complaint under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.*, because, *inter alia*, it is not subject to the prohibitions of the ADA. Recounted below are Plaintiff's well-pleaded allegations, which the court accepts as true and construes in the light most favorable to the Plaintiff. *See Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013) (requiring this approach at the motion-to-dismiss stage).

## BACKGROUND

Plaintiff is an individual with Down syndrome, a genetic disorder that is often associated with developmental delays and some level of intellectual disability.[1] Plaintiff also has diabetes mellitus type 1, which she treats through the use of an insulin pump that regulates her blood glucose level. In order to properly manage her diabetes, Plaintiff must regularly monitor her blood glucose level through self-administered blood samples.

---

[1] Due to her mental capacity and intellectual disability, Plaintiff's interests are represented in this action by her mother and legal guardian, Pam Holman.

Defendant is a non-profit corporation based in the State of Utah that administers the Habilitation Independence Vocation Education Socialization ("HIVEs") program. According to Plaintiff, Defendant uses "its own vans" to provide "educational activity services and transportation services . . . to adult individuals with intellectual disabilities." (Docket No. 2, at 3). The complaint suggests that the HIVEs program involves supervision and instruction of a group of participants by "HIVEs instructors" or "teachers." (*See id.*, at 4). In a letter to Plaintiff referenced in the complaint,[2] Defendant describes the HIVEs program as follows:

> HIVEs is an educational activity program for adults with disabilities. The mission statement of HIVEs is to promote independent life skills and provide opportunities for adults with disabilities to build self-determination by providing, among other things, a safe, independence-oriented environment for people with disabilities as well as affordable community-based respite for parents of children with disabilities. HIVEs accomplishes these objectives by exposing its participants to various community resources and activities such as swimming at the Lehi Legacy Center, eating out, going to the library, participating in physical fitness activities at the American Fork City recreation center, visiting homes for the elderly, and other activities.
> HIVEs does not own any real estate. It does not have a school or similar facility of its own. It operates by picking up program participants from their homes in HIVE[s]-owned vans, which transport them to the various planned activities for the day, and then return them home at the end of the day.

---

[2] This document was submitted to the court as an exhibit to Defendant's Motion to Dismiss. (Docket No. 6-7). However, the court's consideration of this letter here does not convert this Motion under Rule 12(b)(6) into a summary judgment motion under Rule 56. "Generally, a court considers only the contents of the complaint when ruling on a 12(b)(6) motion[,]" *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013), but where a complaint refers to a document that is "central to the plaintiff's claim" and neither party disputes its authenticity, the contents of that document may also be considered, *see GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384–85 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."). Here, the complaint explicitly refers to the letter and its contents as part of its factual allegations of discrimination and invokes the letter's contents as evidence that Defendant did not properly conduct an "objective, individualized assessment" of the risks posed by Plaintiff's continued participation in the HIVEs program. (*See* Docket No. 2, at 5 ¶ 20, 7 ¶ 30). Thus, the letter supports Plaintiff's argument that Defendant denied her participation in the program because of her diabetes and is "central" to her claim that Defendant failed to individually assess the reasonableness of her accommodation request. *See Berneike*, 708 F.3d at 1146; *GFF Corp.*, 130 F.3d at 1384–85. More importantly, because it "reaffirm[s] . . . the denial of access" to the HIVEs program as a result of her diabetes and associated complications, (Docket No. 9, at 5), the letter likely constitutes the operative denial of reasonable accommodation in and of itself. Finally, neither party disputes the authenticity of the letter and both parties repeatedly cite to it in their filings with the court. (*See, e.g.*, Docket No. 9, at 17, 19). Accordingly, the court finds that the letter is appropriately considered in ruling on Defendant's Rule 12(b)(6) motion.

(Docket No. 6-7, at 3).

Plaintiff has participated in the HIVEs program for approximately ten years. In March of 2016, Plaintiff's mother contacted the director of Defendant and the HIVEs program, Michelle Holbrook, to report her concerns regarding the safety of Plaintiff during her regular blood glucose checks. Plaintiff's mother was primarily concerned that HIVEs instructors were allowing Plaintiff to check her blood glucose levels away from the other participants and without adequate supervision. Ms. Holbrook relayed these concerns to the instructors who supervised Plaintiff's participation in the program and requested a face-to-face meeting with Plaintiff's parents to further discuss "safety and supervision" in the program. However, just prior to the planned meeting, Ms. Holbrook e-mailed Plaintiff's mother and indicated that Plaintiff's "medical needs are beyond the ability of HIVEs instructors to manage." (Docket No. 2, at 4). Ms. Holbrook informed Plaintiff's mother that their planned meeting was cancelled and that Plaintiff would not be allowed to participate in the program after April 1, 2016.

Shortly after this exchange, Plaintiff's mother contacted Defendant through counsel, arguing that Defendant's exclusion of Plaintiff from the HIVEs program violated Title III of the ADA and specifically requesting that Plaintiff be allowed to reenter the program. Defendant responded through counsel that Title III's prohibitions were not applicable to the HIVEs program and that the program simply could not accommodate Plaintiff's needs. Plaintiff has not participated in the HIVEs program since April 1, 2016.

Plaintiff, through her mother and legal guardian, filed a complaint against Defendant on May 2, 2016, alleging that Defendant's conduct in excluding her from the HIVEs program violated Title III of the ADA and requesting declaratory and injunctive relief. (Docket No. 2). On May 31, 2016, Defendant filed the instant Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6),

arguing that Plaintiff's complaint failed to state a claim under Title III. (Docket No. 6). Plaintiff filed a memorandum in opposition to Plaintiff's Motion on July 7, 2016. (Docket No. 9). Defendant filed a reply on July 21, 2016. (Docket No. 10). The court held oral argument on the Motion on October 3, 2016. (Docket No. 16). After oral argument, the court ordered simultaneous supplemental briefing on whether the prohibitions of Title III extended beyond physical places and whether the HIVEs program fell within those prohibitions. (Docket No. 15). Plaintiff and Defendant each submitted a supplemental memorandum on October 17, 2016. (Docket Nos. 19, 20). Each party also submitted a reply to these memoranda on October 24, 2016. (Docket Nos. 21, 22). The court now considers the arguments of the parties under jurisdiction granted by 28 U.S.C. § 1331.

## DISCUSSION

The ADA was enacted "in 1990 to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674, 121 S.Ct. 1879 (2001). Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). A private entity is considered a "public accommodation" if 1) its operations affect commerce and 2) the entity or its facilities fall into one of twelve general definitional categories. *See* § 12181(7). Each definitional category includes several enumerated examples of qualifying entities, but these examples "aren't exhaustive; rather they serve as mere illustrations" of the category itself. *See Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1230 (10th Cir. 2016) (internal citation omitted). Moreover, because Title III of the ADA is a remedial measure, this court "must construe § 12181(7)[] liberally to afford

individuals with disabilities access to the same establishments available to those without disabilities." *See id.* (citing *PGA Tour*, 532 U.S. at 676–77 and *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 983 (10th Cir. 2002)). Nevertheless, an entity or its facilities must fall within at least one of the general categories listed in § 12181(7) in order to be subject to the prohibitions of § 12182. *See* U.S. Dep't of Justice, *ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities* § III-1.2000, www.ada.gov/taman3.html (last visited Mar. 29, 2017) ("Can a facility be considered a place of public accommodation if it does not fall under one of these 12 categories? No, the 12 categories are an exhaustive list."); 28 C.F.R. 36, app. C, at 893 ("In order to be a place of public accommodation, a facility . . . must fall within one of these 12 categories. While the list of categories is exhaustive, the representative examples of facilities within each category are not.").

Here, Plaintiff argues that the HIVES program falls "squarely within at least two of the established Title III categories of 'public accommodation.'"[3] (*See* Docket No. 9, at 3 n.1 (emphasis omitted)). Plaintiff first asserts that the HIVES program can be properly categorized as a "place of education" under 42 U.S.C. § 12181(7)(J), which construes "a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education" as a "public accommodation" for purposes of Title III. In the alternative, Plaintiff insists that the HIVES program may be categorized as a "social service center establishment" under subsection (7)(K). § 12181(7)(K) (defining as a "public accommodation" any "day care center, senior

---

[3] In her complaint, Plaintiff also alleged that the HIVES program may also be classified as a "demand responsive service" under § 12181(3), but only lightly defends that proposition in briefing. The court will address this allegation more fully below.

Additionally, there appears to be some confusion as to whether Defendant itself or the HIVEs program is alleged to be the operative "place of public accommodation" under § 12182(a). The court believes that the best reading of the complaint alleges that Defendant is a "private entity" that administers the HIVEs program, which is itself alleged to be a public accommodation under Title III. *See* § 12182(a). This reading of the complaint is in keeping with Plaintiff's argument in response to the Motion to Dismiss. (*See* Docket No. 9, at 3 n.1).

citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment"). Defendant responds that the HIVES program is not a "place of public accommodation" under § 12182(a) because it is not a "place" at all, but a program. (Docket No. 10, at 3 n.3). To determine whether the HIVES program may be properly categorized as a "place of education" or a "social service center establishment," the court must first decide whether Title III's definition of "public accommodation" is restricted to physical places.  As explained below, the court concludes that Title III's definition is so restricted.

> **I.    Section 12182(a)'s prohibitions are restricted to physical "place[s] of public accommodation."**

Plaintiff urges that Title III's definition of "public accommodation" is not restricted to physical places, (Docket No. 19, at 2–6), and invites the court to adopt the reasoning of the First, Second, and Seventh Circuits, which have each held that Title III's prohibitions extend beyond physical places, *see Carparts Distribution Ctr., Inc. v. Auto. Wholesalers' Ass'n of New Eng., Inc.*, 37 F.3d 12, 18–20 (1st Cir. 1994) (holding Title III's definition of "public accommodation" was not limited to physical structures, and therefore encompassed a health benefits plan); *Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28, 31–33 (2d Cir. 1999) (holding Title III's prohibitions apply to insurance underwriting practices); *Morgan v. Joint Admin. Bd., Retirement Plan of the Pillsbury Co. & Amer. Fed. of Grain Millers*, 268 F.3d 456, 459 (7th Cir. 2001) (indicating that "public accommodation" under Title III was not limited to a "physical site" and therefore could extend to the terms of a retirement plan). These Circuits concluded that the physical "site" of service "is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services." *See Morgan*, 268 F.3d at 459. The First Circuit, for example, found that the inclusion of "travel service" in § 12181(7)'s list of examples of public

accommodations indicated that Title III reached beyond physical structures, reasoning that "[m]any travel services conduct business by telephone or correspondence without requiring their customers to enter an office in order to obtain their services." *Carparts*, 37 F.3d at 19. Restricting the definition of "public accommodation" to physical structures or places would exclude such transactions from the prohibitions of Title III and thereby "severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages, available indiscriminately to other members of the general public." *See id.* at 20. The court explained: "It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result." *Id.* at 19. Citing the remedial function of the ADA and the general mandate to interpret such measures liberally, *see Levorsen*, 828 F.3d at 1230 (citing *PGA Tour*, 532 U.S. at 676–77 and *Trainor*, 318 F.3d at 983), Plaintiff invites this court to adopt a similar line of reasoning and hold that Title III's prohibitions extend beyond physical places.

This court declines Plaintiff's invitation and instead sides with the Third, Fifth, Sixth, and Ninth Circuits, which have each held that Title III's definition of "public accommodation" is restricted to "actual, physical places." *See Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1010–14 (6th Cir. 1997); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 612–14 (3d Cir. 1998); *Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 & 534 n.23 (5th Cir. 2016). As many of these Circuits have noted, the reasoning undergirding the First, Second, and Seventh Circuits' expansive interpretation of the term "public accommodation" does not square with the plain text of the statute. *See Parker*, 121 F.3d at 1014; *Ford*, 145 F.3d at 614; *Magee*, 833 F.3d at 534 n.23.

Section 12182(a) explicitly prohibits discrimination on the basis of disability in connection with "any *place* of public accommodation." § 12182(a) (emphasis added). Any interpretation that extends the prohibition beyond physical places would render this statutory text utterly superfluous. *See Ford*, 145 F.3d at 612; *cf. Clegg v. Cult Awareness Network*, 18 F.3d 752, 755 (9th Cir. 1994) ("To conclude . . . that Title II [of the Civil Rights Act of 1964] covers organizations having no affiliation with any public facility would be tantamount to finding that an organization is a 'place.' Such an interpretation would be at odds with the express language of the statute."); *Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1272 (7th Cir. 1993) ("To conclude that Title II includes membership organizations . . . , one would have to assume that Congress' use of the term 'place' was mere surplusage in the statute, and that the fifteen specific examples of places fail to illuminate the meaning of the term 'place'."). Moreover, each example and category of "public accommodation" listed in § 12181(7) is a physical place. *See Ford*, 145 F.3d at 612–13; *id.* at 614 ("The litany of terms [in § 12181(7)], including 'auditorium,' 'bakery,' 'laundromat,' 'museum,' 'park,' 'nursery,' 'food bank,' and 'gymnasium[]' refer to places with resources utilized by physical access."); *Weyer*, 198 F.3d at 1114 ("All of the items on [§ 12181(7)'s list of public accommodations] . . . are actual, physical places where goods or services are open to the public, and places where the public gets those goods or services."). Even the term "travel service," which so concerned the First Circuit, must be interpreted as a physical place when read in the context of the other enumerated categories and illustrative examples of public accommodations. *See, e.g.*, § 12181(7)(F) (defining "public accommodation" as "a laundromat, dry-cleaner, bank, barber shop, beauty shop, *travel service*, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a healthcare provider, hospital or other service establishment" (emphasis

added)); *Ford*, 145 F.3d at 614 ("Pursuant to the doctrine of *noscitur a sociis*, the terms that the First Circuit finds ambiguous should be interpreted by reference to the accompanying words of the statute 'to avoid the giving of unintended breadth to the Acts of Congress.'" (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S. Ct. 1579 (1961))); *Parker*, 121 F.3d at 1014 (same); *Magee*, 833 F.3d at 534 n.23 (same). In short, "[t]he plain meaning of Title III is that a public accommodation is a place," *Ford*, 145 F.3d at 612, and "[e]very term listed in § 12181(7) . . . is a physical place open to physical access,"[4] *see Parker*, 121 F.3d at 1014. Accordingly, this court finds that Title III's prohibitions do not extend beyond actual, physical places of public accommodation.[5]

In so ruling, the court acknowledges the "sweeping" remedial purpose of the ADA, *see PGA Tour*, 532 U.S. at 675, but concludes that the law's remedial purpose cannot overcome its plain meaning as written, *see Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 171, 127 S.Ct. 799 (2007) ("[A] statute's remedial purpose cannot compensate for the lack of a statutory basis."); *Rodriguez v. United States*, 480 U.S. 522, 526, 107 S.Ct. 1391 (1987) ("[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law."); *Symons v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238, 241 (D.C. Cir. 1981) ("The fact that legislation has a remedial purpose, however, does not give the

---

[4] And, as noted by the Third Circuit, *Ford*, 145 F.3d at 613, this interpretation of Title III comports with established interpretations of analogous provisions of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a (prohibiting racial, religious, and ethnic discrimination in access to the "goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation"), restricting that statute's prohibitions to physical places, *see Welsh*, 993 F.2d at 1269–75 (holding that Title II's prohibitions did not extend "to membership organizations that do not maintain a close connection to a structural facility"); *Clegg*, 18 F.3d at 755–56 (same).

[5] Plaintiff's reliance on the Department of Justice's briefing on the issue in other cases is unavailing. (*See* Docket No. 22, at 2–4). Insofar as the Department's interpretation of Title III negates the plain statutory requirement of an associated physical place, the court rejects the interpretation as "manifestly contrary" to the plain meaning of the statute. *See Ford*, 145 F.3d at 613 (quoting *Chevron U.S.A., Inc. v. Nat. Res. Defense Council*, 467 U.S. 837, 844, 104 S. Ct. 2778 (1984)) (internal quotations omitted).

judiciary license, in interpreting a provision, to disregard entirely the plain meaning of the words used by Congress.").

## II.     HIVEs is not a "place of public accommodation" under § 12181(7).

Given the definition of "places of public accommodation" explained above, the court must conclude that the HIVEs program, in and of itself, is not a "place of public accommodation" under Title III. However, this conclusion does not end the court's analysis because Plaintiff asserts that the HIVES program may still be considered a "place of public accommodation" insofar as it is associated with certain physical locations and equipment. This argument appears to be based on the premise that an organization, not considered a "place of public accommodation" in and of itself, may nonetheless be considered as such if it "maintains a close connection to a structural facility" that may be classified as a place of public accommodation. *Cf. Welsh*, 993 F.2d at 1269 (interpreting a similar provision of Title II of the Civil Rights Act of 1964); *see also Ganden v. Nat'l Collegiate Athletic Ass'n*, 1996 WL 680000 at *9–*10 (N.D. Ill. Nov. 21, 1996) (unpublished) (analyzing the applicability of *Welsh* to Title III of the ADA). Here, Plaintiff argues that the HIVEs program has a "close connection" to several physical locations or facilities that could make it a "place of public accommodation" under Title III. Specifically, Plaintiff asserts that 1) the program makes use of various places of public accommodation to administer its program; 2) Defendant maintains its headquarters at a physical location; and 3) the program makes use of vans to transport participants to and from educational activities. The court will address each argument in turn.

### A. Places of public accommodation visited by the HIVEs program.

Plaintiff first asserts that the HIVEs program takes participants to various locations which are clearly considered "place[s] of public accommodation" under Title III, such as community

swimming pools, recreation centers, restaurants, libraries, and homes for the elderly. *See* 42 U.S.C. § 12181(7). She insists that these interactions with public accommodations may nudge the HIVEs program itself into the category of a "place of public accommodation." The court disagrees. First and foremost, Plaintiff's complaint does not mention these locations at all, let alone suggest that they could form the basis of liability under Title III. *See Cty. of Santa Fe v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002) (explaining that a district court deciding a Rule 12(b)(6) motion may consider only facts alleged within the complaint, legal argument, and properly referenced documents). But even if the court were to recognize the existence of these locations from the letter referenced by the complaint, § 12182(a) only prohibits discrimination by a private entity who "owns, leases (or leases to), or operates a place of public accommodation." *See* § 12182(a). Plaintiff's complaint does not suggest that Defendant "owns, leases . . . , or operates" any of the places of public accommodation the HIVEs program visits. In fact, the most reasonable inference from the program description in the letter is that the HIVEs program utilizes these public and community resources just like any other group of customers or member of the general public, i.e., without any kind of ownership, lease relationship, or operational role. *See Elitt v. U.S.A. Hockey*, 922 F. Supp. 217, 223 (E.D. Mo. 1996) (finding no evidence that youth hockey league owned, operated, or leased an associated ice rink used for practices); *cf. Jensen v. United First Fin.*, 2009 WL 5066683, at *3–*7 (D. Utah Dec. 16, 2009) (unpublished) (holding that a private entity was a public accommodation under Title III because it *rented* space in hotel rooms to conduct seminars and exercised sufficient control over the rented space). Without an allegation that Defendant "owns, leases . . . , or operates" these facilities and locations, the mere fact that the HIVEs program visits these places cannot make the program a place of public accommodation under Title III.

### B. Defendant's physical headquarters.

Plaintiff next asserts that Defendant's headquarters are an associated physical location that suffices to make the HIVEs program a "place of public accommodation." Here too, the court disagrees. Again, neither the complaint nor the documents referenced in the complaint allege the existence or function of Defendant's physical headquarters. This alone is enough to reject Plaintiff's argument. *See Cty. of Santa Fe*, 311 F.3d at 1035 (explaining that a district court deciding a Rule 12(b)(6) motion may consider only facts alleged within the complaint, legal argument, and properly referenced documents).

But even if the court were to consider the argument, Plaintiff has failed to demonstrate a sufficient "nexus" between Defendant's headquarters and the services or benefits allegedly denied to Plaintiff. *See Parker*, 121 F.3d at 1011 ("There is . . . no nexus between the disparity in benefits [provided to the plaintiff] and the services which [defendant] offers to the public from its insurance office."); *Weyer*, 198 F.3d at 1114–15 (explaining that the terms of Title III "suggest that some connection between the good or service complained of and an actual physical place is required"); *Ford*, 145 F.3d at 613 ("[Plaintiff] cannot point to the[] terms [of Title III] as providing protection from discrimination unrelated to places."); *Shepherd v. U.S. Olympic Committee*, 464 F. Supp. 2d 1072, 1084 (D. Colo. 2006) ("[T]he benefits Plaintiffs seek relate less to the USOC's physical facilities than to the teams they put forth for international competition.").

Instructive here is *Parker*, where the Sixth Circuit held that an allegedly discriminatory benefits plan was not a "place" of public accommodation solely because the private entity that issued the plan maintained an insurance office open to the public. *See* 121 F.3d at 1011. Because the benefit plan was obtained through the plaintiff's employer, not through the insurance office

itself, "there [was] . . . no nexus between the disparity in benefits and the services which [the defendant] offers to the public from its insurance office." *See id.* Here, there is no indication from Plaintiff's argument, her complaint, or any documents referenced therein that Defendant's physical headquarters offers *any* services or benefits to the general public, let alone the services or benefits that Plaintiff claims she was denied. In short, the fact that Defendant maintains a physical headquarters does not make the HIVEs program a place of public accommodation.

### C. The HIVEs program's vans.

Finally, Plaintiff asserts that the HIVEs program's use of vans in administering its program is sufficient to make it a "place of public accommodation." Specifically, Plaintiff argues that the vans are an associated physical place that allows HIVEs to be categorized as either a "place of education" under § 12181(7)(J) or a "social service center establishment" under § 12181(7)(K).[6] As explained below, the court disagrees.

To evaluate whether HIVEs and its vans may be properly categorized as either a "place of education" or a "social service center establishment" the court begins with the plain language of § 12181(7)(J), (K). *See Levorsen*, 828 F.3d at 1231. There is little dispute between the parties that HIVEs provides "education" and "social service[s]" to its clients. Therefore, the court need only decide whether the program, together with its associated vans, is a "*place* of education" or a

---

[6] Though Plaintiff has only cursorily argued the point here, her complaint also alleges that the HIVEs program may be classified as a "demand responsive system" under § 12181(3). Whether or not the HIVEs program qualifies as a "demand responsive system" under the broad statutory definition of that phrase, § 12182(a) only applies to such systems in connection with "places of public accommodation," as explained in more depth below. *See Ramos v. Uber Tech., Inc.*, 2015 WL 758087 at *5 (W.D. Tex. Feb. 20, 2015) (unpublished) (analyzing the distinction between demand responsive systems subject to § 12182(a) and those subject to § 12184(a)); § 12182(b)(2)(C) (requiring private entities that are subject to § 12182(a), i.e., those that own, operate, or lease a place of public accommodation, *and* operate a demand responsive system to provide an equivalent level of service to the disabled). As Plaintiff has failed to allege any associated place of public accommodation, the court rejects Plaintiff's argument that the HIVEs program is subject to § 12182(a) because it is a "demand responsive system." Demand responsive systems divorced from any place of public accommodation are governed by the prohibitions of § 12184(a), which is not alleged as a basis of liability in Plaintiff's complaint. Moreover, that section applies only to "private entit[ies] that [are] *primarily* engaged in the business of transporting people[,]" *see* § 12184(a) (emphasis added)— a requirement that does not readily apply to Defendant.

"social service *center establishment*" under Title III. Neither term is defined in the statute. However, the plain or ordinary meaning of these terms may be discerned by resort to "commonly accepted dictionary definitions." *See In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1385 (10th Cir. 1998). To resolve ambiguity arising from "several workable definitions" of a general statutory term, the court looks to the surrounding language of the statute to derive contextual meaning. *See United States v. Brune*, 767 F.3d 1009, 1022–23 (10th Cir. 2014); *Levorsen*, 828 F.3d at 1231 n.4. Using this interpretive framework, the court will first address the definition of "place of education" and then the definition of "social service center establishment."

### 1. Place of Education

First, Plaintiff asserts that the HIVEs program may be generally categorized as a "place of education" under § 12181(7)(J). Upon evaluating the plain meaning of that general term, the court disagrees.

A "place" can be defined loosely as a "space [or] room" or more narrowly as "a building or locality used for a special purpose." *The Merriam-Webster Dictionary* 548 (2016) [hereinafter *Merriam-Webster*]. Applying these definitions in this context results in a slight ambiguity since a van or other vehicle could conceivably be categorized as a "space," but is likely not "a building or locality." The court therefore turns to the surrounding context of the statutory term for clarity. *See Levorsen*, 828 F.3d at 1231 n.4 (quoting *Brune*, 767 F.3d at 1022) (allowing courts to look to canons of construction and context to determine plain meaning where "multiple dictionary definitions 'preclude[] an obvious, unitary usage'").

Because the general term "place of education" follows a list of specific examples, *see* § 12181(7)(J), the canon of *ejusdem generis*—which holds that "when 'general words follow specific words in a statutory enumeration, the general words are construed to embrace only

14

objects similar in nature to those objects enumerated by the preceding specific words'"—is especially helpful here, *see Brune*, 767 F.3d at 1023 (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15, 121 S. Ct. 1302 (2001)). Each of the specific examples listed under § 12181(7)(J) ("a nursery, elementary, secondary, undergraduate, or postgraduate private school") is a "building or locality" and not simply a "space [or] room." [7] Therefore, under the canon of *ejusdem generis*, these specific terms clearly indicate that the general term "place of education" refers to a "building or locality" that provides educational services. *See Magee*, 833 F.3d at 534 (applying the principle of *ejusdem generis* to define the term "sales establishment" in § 12181(7)(E)).

With this definition of the general term in mind, it is clear that HIVEs is not a "place of education" as that phrase is used in § 12181(7)(J). Though the program provides educational services, neither the program itself nor the vans it uses can be reasonably categorized as "building[s] or localit[ies]" as those terms relate to § 12181(7)(J)'s use of the general term "place of education." Therefore, the court rejects Plaintiff's argument and holds that HIVEs is not a "place of education" under § 12181(7)(J).

**2.  Social Service Center Establishment.**

Next, Plaintiff argues that HIVEs may be generally categorized as a "social service center establishment" under § 12181(7)(K). Again, the court disagrees.

An "establishment" is commonly defined as a "'place of business' or 'a public or private institution ([such] as a school or hospital).'" *Levorsen*, 828 F.3d at 1231 (alterations in original) (quoting *Webster's Third New International Dictionary* 778 (2002)); *see also Magee*, 833 F.3d at 534–35 (tracking a substantively identical definition of "establishment" through multiple

---

[7] These examples also limit the meaning of "locality" to a physical location, such as a structural facility.

dictionaries). The Supreme Court has explained that the term "establishment" is "normally used in business and in government . . . as meaning a distinct physical place of business." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496, 65 S. Ct. 807 (1945). However, the term at issue here is "*social service* center establishment," § 12181(7)(K) (emphasis added), which suggests that the term refers to public or private institutions that provide social services rather than places of business. And the inclusion of the term "center"—defined as a "a place where a particular activity or service is concentrated[, such as] a medical center"—suggests that the institution at issue must be housed in a physical structure or location or at least administer social services from a physical structure or location.[8] *See The American Heritage Dictionary (Third Ed.)* 310 (1992) [hereinafter *American Heritage*]; *see also Webster's Third New International Dictionary* 362 (1971) [hereinafter *Webster's Third*] (defining "center" as "a concentration of requisite facilities for an activity, pursuit, or interest, along with various likely adjunct conveniences" and giving examples of a shopping center, medical center, or amusement center). Combining these various definitions, the court concludes that the general term "social service center establishment" as used in § 12181(7)(K) is a physical location or structure owned or operated by an institution in order to administer social services.

Again, applying this definition of the general term, the court concludes that HIVEs is not a "social service center establishment" under § 12181(7)(K). While the program could conceivably be considered an institution that deals in social services, it lacks an associated fixed

---

[8] Again, as described above, a "place" is best defined in this context as a "building or locality used for a special purpose." *Merriam-Webster* at 548. Additionally, while an "institution" may conceivably encompass either a non-physical organization or perhaps a non-fixed physical location, *see Merriam-Webster* at 376 (defining "institution" as "a society or corporation esp. of a public character"), the court concludes that an "institution" in this context is best defined as an entity that owns or operates a location or structure that provides social services. This owes to the inclusion of the word "center," as described above.  Additionally, in defining "establishment" as that term is used in § 12181(7), the Tenth Circuit cites fixed, physical structures ("a school or hospital") as examples of the term "institution." *See Levorsen*, 828 F.3d at 1231.

physical location or structure. Further, the vans the programs utilizes cannot be considered a "center" or "establishment" under § 12181(7)(K). Insofar as those terms are ambiguous enough to encompass a van or other vehicle, the application of *ejusdem generis* again removes any ambiguity: all of the specific examples preceding the general term "social service center establishment" in § 12181(7)(K) ("a day care center, senior citizen center, homeless shelter, food bank, adoption agency") are plainly fixed structures, buildings, or groupings of facilities that provide social services. The court notes that these specific statutory examples align with examples provided to explain the common, ordinary meaning of the term "center" cited above, including "medical center," *American Heritage* at 310, "shopping center," or "amusement center," *Webster's Third* at 362. Though the HIVEs program may provide social services, neither the program nor its vans can be construed as fixed structures, buildings, or groupings of facilities.[9] Therefore, the court holds that HIVEs is not a "social service center establishment" for purposes of § 12181(7)(K).

Based on the foregoing, the court concludes that HIVEs cannot be construed as either a "place of education" under § 12181(7)(J) or a "social service center establishment" under § 12181(7)(K). The court notes that this conclusion—that neither the HIVEs program nor its vans

---

[9] Plaintiff cites to DOJ regulations that define a "place of public accommodation" as "a facility operated by a private entity whose operations affect commerce and fall within at least one of the [twelve statutory] categories" of public accommodations. 28 C.F.R. § 36.104. "[F]acility[,]" in turn, is defined under the regulations as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." *Id.* Plaintiff argues that the HIVEs program's vans may be categorized as a "facility" under the regulation because they are "equipment" or "personal property." (Docket No. 19, at 9). Whether or not vans or other vehicles fit those terms as they are used in the regulation, they do not fall within "at least one of the [twelve statutory] categories" of covered public accommodations as required by the regulation, *see* § 36.104, and the statute itself, *see* 42 U.S.C. § 12181(7); *Magee*, 833 F.3d at 533–36 (affirming district court decision that held that while vending machines could be construed as "equipment" or "personal property" under the regulations, they "are not akin to any of the twelve specific categories of places of public accommodation listed in the statute and the federal regulations" (internal quotations omitted)). Insofar as the regulation contemplates including vans or other vehicles within the twelve statutory categories of public accommodations as enumerated in § 12181(7) or in the regulation itself, the court rejects that interpretation as "manifestly contrary" to the plain meaning of the statute. *See Ford*, 145 F.3d at 613 (quoting *Chevron*, 467 U.S. at 844).

are places of public accommodation—is bolstered by the fact that Title III makes a clear distinction between places of public accommodation and transportation systems. *See Ramos*, 2015 WL 758087, at *5 (emphasis in original) (referring to Title III's heading "Public Accommodations and Services Operated by Private Entities": "Title III expressly applies to public accommodations *and* certain services operated by private entities." (emphasis in original)). This distinction is especially obvious in the structure of § 12182: While that section clearly prohibits discrimination on the basis of disability in the administration of "fixed route" and "demand responsive" transportation systems, *see* § 12182(b)(2)(B)–(C), the statute treats those transportation systems as "goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation" and *not* as "place[s] of public accommodation" themselves, *compare* § 12182(a) (prohibiting discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation") *with, e.g.*, § 12182(b)(2)(C)(ii) (defining "discrimination" under § 12182(a) as the failure of a private entity that operates a demand responsive system to make that system "readily accessible to and usable by individuals with disabilities" or to otherwise provide a level of service to the disabled that is not "equivalent to that provided to individuals without disabilities"). In other words, the transportation system is treated as an accommodation *provided by* the requisite "place" referenced in § 12182(a). Section 12182 therefore prohibits discrimination in the administration of transportation systems operated by a place of public accommodation or by a private entity that owns, leases, or operates a place of public accommodation, such as a shuttle service operated by a hotel.[10] *See Ramos*, 2015 WL

---

[10] Private entities that are "primarily engaged in the business of transporting people" and operate a demand responsive system or other transportation system *without* connection to a place of public accommodation are subject to the prohibitions of § 12184. *See* § 12184(a); *Ramos*, 2015 WL 758087, at *5 ("Title III divides those private entities that operate a demand responsive system into two covered groups: (1) private entities (whether public

758087, at *5; *Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 317 F.R.D. 91 (N.D. Cal. 2016) (evaluating a class action suit under § 12182(a) against a hotel chain for its alleged failure to accommodate disabled individuals who desired to use the hotels' shuttle system). Thus, it is clear that the statute itself does not classify services like the HIVEs program as places of public accommodation, but as services of such places. As Plaintiff has failed to allege any qualifying associated place, the court concludes that the HIVEs program is not a "public accommodation" under § 12181(7). Accordingly, Defendant is not subject to the prohibitions of § 12182(a).

## CONCLUSION

The court holds that the prohibitions of § 12182(a) of Title III of the Americans with Disabilities Act do not apply to the HIVEs program or to Defendant as pled. As a result, Plaintiff has failed to state a claim against Defendant under that Act. Consequently, Defendant's Motion to Dismiss (Docket No. 6) must be **GRANTED** and Plaintiff's claims against Defendant are **DISMISSED**.

IT IS SO ORDERED.

Signed this 30th day of March, 2017.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

---

accommodations or not) that provide specified public transportation services and are 'primarily engaged in the business of transporting people and whose operations affect commerce," which are subject to § 12184 (these include taxi services), and (2) public accommodations that operate a demand responsive system but that are not primarily engaged in the business of transporting people (*i.e.*, not subject to § 12184), which are subject to § 12182(b)(2)(C) (these include hotels with hotel shuttles)."). But Plaintiff has not alleged a violation of this section.